## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**MARY L. TRUVILLION**                                        **CIVIL ACTION**

**VERSUS**                                                        **NO: 13-3706-NJB-SS**

**CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

The plaintiff, Mary Lee Truvillion ("Truvillion"), seeks judicial review, pursuant to Section

405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social

Security Administration (the "Commissioner") denying her claim for supplemental security income

("SSI") under Title XVI of the Act, 42 U.S.C. § 1382.

## PROCEDURAL HISTORY

A.      June 20, 2008 Decision.

On November 27, 2006, Truvillion submitted an application for SSI alleging an onset date

of November 15, 2006.  R. 118 and 304-06.  The application was denied.  There was a hearing

before an Administrative Law Judge ("ALJ").  An unfavorable decision was issued on June 20,

2008.  On December 5, 2008, the Appeals Council denied the request for review.  R. 118.  There is

no record of an appeal of that decision to federal court.

B.      May 24, 2010 Decision.

On March 7, 2009, Truvillion submitted an application for SSI alleging the onset date was

November 15, 2006.   R. 307-09.[1]   Truvillion reported hypertension, arthritis, diabetes and degenerative disc disease. R. 334.  On August 5, 2009, Truvillion's application was denied.  R. 150-53.  On March 10, 2010, there was a hearing before an ALJ.  Participating were Truvillion, her counsel, a vocational expert, and Kweli Amusa, M.D., a medical expert.  R. 36-68.  The ALJ stated that the doctrine of *res judicata* applied to the period from November 15, 2006 through June 20, 2008, and therefore that period it was not considered.  R. 118.  On May 24, 2010, the ALJ issued an unfavorable decision.  R. 118-132.  Truvillion requested review.  R. 209-213.

C.      April 19, 2012 Decision.

On October 20, 2010, Truvillion submitted a claim for SSI.  On December 3, 2010, she was determined by a State agency to be disabled.   R. 139-146.[2]

On March 25, 2011, the Appeals Council indicated that it would combine the May 24, 2010 decision with the December 3, 2010 determination and remand them to an ALJ for more action and a new decision.  R. 214-217.  On June 6, 2011, the Appeals Council remanded the matter to the ALJ for further proceedings.  R. 133-136.

On January 26, 2012, there was hearing before the ALJ.  The following participated: Truvillion by telephone; her counsel, who was present at the hearing; and a medical expert, Dr. Earl Beard, who also participated by telephone.  R. 69-83.  On April 3, 2012, there was a further hearing before the ALJ where Truvillion, her counsel and a vocational expert were present.  R. 84-113.  On

---

[1]  The May 24, 2010 decision reports that on February 11, 2009 Truvillion protectively filed an application for SSI with an alleged onset date of November 15, 2006.  R. 118.  The April 19, 2012 decision (discussed infra) also reports that on February 11, 2009 Truvillion filed an application for SSI.  R. 14.  The administrative record does not contain such an application.  It has applications for SSI dated November 27, 2006 and March 7, 2009.  R. 304-309.

[2]  The March 25, 2011 notice from the Appeals Council refers to the State agency's favorable determination as dated December 3, 2010.  R. 214.  The April 19, 2012 decision refers to it as dated December 20, 2010.  R. 14.

April 19, 2012, the ALJ issued an unfavorable decision.  R. 14-28.  On March 21, 2013, the Appeals Council denied the request for review.  R. 1-4.

On May 22, 2013, Truvillion filed a complaint in federal court.  Rec. doc. 1.  The parties submitted cross-motions for summary judgment.  Rec. docs. 16 and 17.

## STATEMENT OF ISSUES ON APPEAL

**Issue no. 1.**      Is the transcript of the January 26, 2012 hearing sufficiently complete?

**Issue no. 2.**      Did Truvillion have sufficient opportunity to cross-examine Dr. Beard at the January 26, 2012 hearing?

**Issue no. 3.**      Whether substantial evidence and relevant legal precedent support the ALJ's determination regarding Truvillion's residual functional capacity ("RFC")?

## THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant on appeal:

1.      Truvillion has not engaged in substantial gainful activity since February 11, 2009, the application date (20 C.F.R. §416.971 et seq.).

2.      Truvillion has the following medically determinable impairments: degenerative disc disease of the lumbar and thoracic sections of the spine, fibromyalgia, osteoarthritis, chronic pain, hypertension, diabetes mellitus and anxiety (20 C.F.R. §416.920(c)).

3.      Truvillion does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

4.      Truvillion has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except she requires the ability to alternate positions as needed while remaining on task.  She can never climb ladders, ropes, and scaffolds, but can occasionally crouch, crawl, kneel, balance, stoop, and climb ramps and stairs.  She can perform frequent fine manipulation with the bilateral hands, and she must avoid concentrated exposure to extreme heat, cold, and vibration.  She can only perform simple, repetitive, and routine work of an unskilled nature.

5.      Truvillion is unable to perform any past relevant work (20 C.F.R. § 416.965).

6.      Truvillion was born in 1969 and was 39 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 C.F.R. § 416.963).

7.      Truvillion has a limited education and is able to communicate in English (20 C.F.R. §416.964).

8.      Transferability of job skills is not an issue in this case because Truvillion's past relevant work is unskilled (20 C.F.R. § 416.968).

9.      Considering Truvillion's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Truvillion can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

10.     Truvillion has not been under a disability, as defined in the Act, since February 11, 2009, the date the application was filed (20 C.F.R. § 416.920(g)).

R. 17-28.

## ANALYSIS

a.      **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617

(5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[3] The five-step inquiry terminates

---

[3] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).  When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.

"In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history."  Perez, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

---

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

b.      **Testimony at the Hearings.**

1.      <u>March 10, 2010 Hearing</u>.

The ALJ noted that this was Truvillion's third hearing and sixth application.  R. 62.

Truvillion had completed the seventh grade.  R. 63.  She never had a driver's license.  R. 66.
Truvillion's attorney reported that she indicated that she last worked in 2004 when she babysat for
two children.  She never did any other work.  She was paid about $100.00 per week.  R. 62.

Truvillion stopped working because of her back pain.  R. 47-48.  She experienced a lot of
pain.  R. 48.  Sometimes it started in her neck.  R. 48.  The worst pain was in the middle of her back.
R. 48.  It started in the middle of her upper back and went down.  R. 48.  It felt like someone
punching her in the back.  Sometimes it hit so hard, it "broke her down."  R. 49.  She did not sleep
much at night because of the pain.  R. 48.  Sometimes her back would go out for 2 or 3 days.  She
could not move or get out of bed.  A nurse had to help her turn over.  R. 49.  The pain was worse
when she got out of bed.  R. 50.  When she moved around, it became worse.  R. 50.  When she took
her pain pills, it eased.  The pills did not stop the pain.  R. 50.

Truvillion had taken morphine and Oxycontin.  At the time of the hearing she only took
Percocet (four and a half pills per day).  R. 50.  The medication caused her to sleep.  R. 52.  She took
Xanax and Ambien to help her sleep at night.  R. 51.

Truvillion had hypertension and migraine headaches.  R. 52.  She took BuSpar for the
headaches.  R. 52.  Up to a year before the hearing she could visit friends, go to movies and go out
to eat, but her condition had become worse.  She could no longer do those activities.  R. 52-53.

The nurse helped her with bathing, grooming, grocery shopping, laundry and cooking.  R.

51. Truvillion lived in an apartment equipped for handicapped persons. R. 51. She did not do any chores. R. 53. Her main doctor was Dr. Spady, a rheumatolgist. R. 51 and 54. He decided she needed home health care because of her back and because she kept falling. R. 51-52.

Kweli Amusa, M.D., a specialist in internal medicine, testified. He had not examined or treated Truvillion. R. 38. Dr. Amusa reviewed medical records concerning Truvillion which were provided by the Commissioner. R. 39.[4] Truvillion had not had any other MRIs or nerve conduction studies in the last couple of years. R. 54.

Dr. Amusa reported that Truvillion had a history of hypertension and diabetes. She was on oral medication for diabetes. Her biggest problem was chronic low back pain. She had a neuropathy problem with her leg. R. 42. In his opinion, the conditions or impairments did not meet or equal any of the listings. R. 42 and 44.

Dr. Amusa referred to a report by Dr. Choudry, a neurologist, dated November 16, 2009, in which Truvillion was evaluated for chronic low back pain. His examination did not reveal a problem with her balance. There was no disturbance in her gait. Her strength was good. She could heal-toe walk. There was some mild decreased range of motion. MRIs of the cervical and lumbar spine in 2007 revealed degenerative changes with minimal bulging in the cervical and thoracic (levels T2 through T5) and mild bulging in the lumbar spine at levels L2 through L5. R. 44-45. There was narrowing (osteophyte) at L5-S1 which could be causing some pressure on the nerve at S1. R. 45. Truvillion was treated by a pain management physician with narcotics. R. 45.

---

[4] Prior to the hearing, Dr. Amusa reviewed exhibits C1F to C21F (R. 419-654). R. 39. He was not sent all of Exhibit C22F - medical evidence from Northlake Rheumatology ("Northlake") (R. 655-685). R. 39. He had Northlake records from November 2009. R. 41. During the hearing the additional Northlake records were faxed to him. R. 41, 43 and 44. Dr. Amusa reviewed them. R. 47. They were for visits to Dr. Spady on May 14 and December 22, 2009. R. 54 and 56.

In response to the ALJ's question about his opinion on Truvillion's psychiatric status, Dr. Amusa testified that he was not a psychiatrist. R. 46. The records revealed she was treated for anxiety and depression arising from chronic pain. R. 46.

Dr. Amusa noted that on December 22, 2009, Dr. Spady did a very thorough history and review of her systems. The diagnosis was osteoarthritis in her spine, chronic pain in her extremities, depression, and fibromyalgia. R. 54-56. There were some arthritic changes in her fingers. R. 54. The neurologic exam was unremarkable. Her cranial nerves were intact. While she had some discomfort in her knees with flexion and extension, her muscle strength was good. R. 55. She was acutely tender in all of her joints. R. 55.

Dr. Amusa described Truvillion's limitations and restricted her to sedentary-type activity. R. 45 and 57.

Dr. Amusa testified that it was unusual to see a patient who suffers from pain on a daily basis who did not experience some depression. The severity of the level of depression will vary. R. 58-60. Because Truvillion was on a high dosage of Xanax, it was more of a diagnosis of anxiety than depression. R. 59. Because the medication worked well for some patients and not for others, there was no one answer on the limitation for anxiety and depression. R. 59-60.

The vocational expert was asked about unskilled sedentary work for a younger individual with a limited education. The ALJ added limitations based on Dr. Amusa's testimony. R. 64-65.

    2.    <u>January 26, 2012 Hearing</u>.

Truvillion was unable to be present at the hearing, and therefore she participated by telephone. Her counsel was present at the hearing. Earl F. Beard, M.D., testified by telephone. He

was board  certified in internal medicine and cardiovascular disease.  R. 73.  Dr. Beard received

Exhibits C1F to C32F (R. 419-782) prior to the hearing.  R. 73.

Truvillion was diabetic and had hypertension.  R. 74-75.  She reported low back pain and

generalized muscular pain with very little evidence to support any major pathology.  R. 75.  Dr.

Beard did not believe that Truvillion's impairments did not meet or medically equal any of the

listings.  R. 75.  Dr. Beard did not consider her back problem, the stenosis and the impingement at

S1, a severe impairment.  R. 75.  He expected that Truvillion would be able to tolerate light physical

activity and that she start at a sedentary level and hope to improve to the restricted light level.  R.

77.  Dr. Beard testified that his opinion would not be altered by Dr. Spade's finding that she was

positive for node and effusion in her hands bilaterally.  R. 78.

> 3.    <u>April 3, 2012 Hearing</u>.

Truvillion was 42 at the time of hearing.  R.  91.  She was not married.  R. 91-92.  She had

two children.  R. 100.  The oldest was 25 and did not live with her.  R. 100.  The younger one was

19 and lived with her.  R. 100.  Her house was equipped for handicapped living.  R. 92.  Her doctor

said she required such a house.  R. 92.  Section 8 paid the rent.  R. 92.  She did not have a driver's

license.  R. 93.  She had completed the eighth grade.  R. 93.  She had difficulty reading.  R. 93. Her

last work was in 1998 as a babysitter.  R. 93.  She did it for 2 or 3 years.  R. 94.

When her back became bad and she was falling, she spoke to her doctor who gave her a

telephone number for the State of Louisiana.  Representatives of the State came to her home and

evaluated her situation.  The State determined that she needed home health care.  R. 102-103.  The

home health nurse worked 26 hours a week.  R. 102.  Truvillion had the nurse for 3 or 4 years.  R.

103.

She saw a neighbor about 3 times a weeks.  She did not see anyone else on a regular basis except her nurse and children.  R. 104.  She did not get along with her younger son or her nurse.  R. 101.  The nurse got on her nerves.  R. 101.  She had problems relating to people.  R. 101.

Truvillion experienced pain in her lower back, upper back, neck and legs.  R. 94.  It felt like someone was punching her back.  R. 94.  When she laid down and when she walked her pain was worse.  R. 94.  Nothing made it better.  R. 94.  She was told that surgery would not help her.  R. 94.  She took Oroxine and Oxycodone for pain but they were too strong.  At the time of the hearing, she took Lortab.  R. 95.  For all of her conditions, she took 31 pills a day.  R. 97-98.  The side effects from the medication included fatigue and depression.  R. 98.

Truvillion had diabetes.  R. 95.  It affected her eyes.  R. 95.  She took eye drops three times a day.  R. 96.  She experienced blurry vision.  R. 96.  She experienced swelling in her joints.  R. 95.

Truvillion could not work because of her back, bad nerves, and poor vision.  R. 100.  She was unable to do chores.  R. 96.  The home health nurse did all the chores, including laundry, cooking, and grocery shopping.  R. 97.  Truvillion could only sit for 10 to 15 minutes before she had to get up.  R. 97.  She could only stand 10 to 15 minutes before she had to sit down.  R. 97.  She only walked in her house.  R. 97.  She could not bend.  R. 98.

She did not do her own hair.  R. 98.  When she reached over head she had problems with her hands.  R. 105.  Sometimes they shook.  R. 105-106.  She could use her hands to hold a cane.  R. 98.  Sometimes she was unable to use her hands to eat and button her clothes.  R. 98 and 106.  She experienced swelling on the tops of her hands.  R. 106.  When this occurred, she soaked them in alcohol to ease the pain.  R. 106.

11

She went to the Rosenblum mental health center for a nervous breakdown. She was confined for 3 days because of hallucinations. R. 99. Prior to that incident she had trouble sleeping. R. 100. Her younger son called the police when she had the nervous breakdown, r. 101, which occurred in November, 2011. R. 105. She went to Beacon Behavioral Hospital. She tested positive for PCP and barbiturates. R. 103. She had never done PCP or barbiturates. R. 103-105. That was the only such incident. R. 105.

The vocational expert described Truvillion's past work as a babysitter as medium semi-skilled. R. 107. Based on the first hypothetical question, she could not return to her past work. R. 108. She could do unskilled sedentary work; for example a cashier. R. 108. With the second hypothetical, she could not return to her past work and there would be no jobs available. R. 109.

c.   **Medical Evidence**.

<u>2006</u>

On October 16, Truvillion went to the emergency room at Hood Memorial Hospital ("Hood Memorial") with reports of pain from ingrown toenails on each foot, pain in the abdomen and low back pain. She was told to increase her fluid intake, consume cranberry juice and take Ibuprofen for discomfort. R. 435-36 and 439.

On November 8, she was seen by Derris W. Ray, M.D., in Amite with complaints of fever blisters, pain in her legs and coughing. R. 454. A November 8 x-ray for ankle pain and swelling revealed mild soft tissue swelling about the ankle and no apparent fracture. R. 433.

On November 13, Dr. Ray denied a prescription refill for cough syrup. R. 454. On November 14, she reported pain in her back and legs. R. 453. On November 15, it was noted that she wanted to take cough medication more frequently. R. 467.

12

A November 15 CT scan of the lumbar spine revealed: (1) mild to moderate spondylosis at L4-5; (2) a focal disc bulge at L5-S1 with contact at the S1 nerve root; and (3) unremarkable for remainder.  R. 466.  A November 25 ultrasound did not reveal any evidence of deep venous thrombosis.  R. 465.

On November 20, she reported to Dr. Ray that her ears hurt, tooth ached, ankle hurt, toe was white, her throat was sore, and she was nauseous.  R. 452.  The notes indicate that she understood that Dr. Ray would not treat chronic pain or write frequent prescriptions for narcotics.  Id.  On November 22, her request for cough syrup stronger than Lortab was denied.  Id.  She was referred to pain management.  R. 451.

On November 23, she went to the Hood Memorial emergency room with complaints of low back pain.  R. 460.  Naprosyn was prescribed.  She was restricted to lifting no more than 10 pounds. She was to see her primary care doctor for a referral to physical therapy and stretching exercises. R. 462.

<u>2007</u>

On January 27, Truvillion was seen Sujal Shah, M.D., for a consultative examination.  R. 474.  She reported back pain which was getting progressively worse, diabetes for which she took medication, and headaches for which she took analgesics.  R. 474.  She was able to dress herself, but occasionally needed help.  She could feed herself.  She did not do household chores which were done by her children.  She did not drive.  R. 474.  She ambulated with mild difficulty getting on and off the exam table.  She could walk on her toes and squat.  R. 476.  Because of the stenosis at L5-S1, she would have some back pain.  She had no physical evidence of an overt abnormality in the lumbar spine.  Dr. Shah concluded that it may be difficult for her to continuously bend or stoop for

long periods of time, but she was able to stand, sit, walk and manipulate objects without any difficulty whatsoever.  R. 476.

On April 13, Truvillion began going to New Life Medical Center ("New Life") every other week for pain management.  She reported low back pain, hypertension, chronic headaches and gastroesophageal reflux disease ("GERD"). R. 505.  Lortab and another medication were prescribed. R. 505.  On April 23, she was seen at New Life for low back pain, pain in both arms, and swelling in her ankles.  She asked for a prescription for a muscle relaxant because of muscle spasms in her upper neck and low back.  Her prescriptions were refilled and Flexeril, a muscle relaxant, was prescribed.  R. 504.

On May 7, Truvillion was seen at New Life for uncontrolled low back pain.  Her prescriptions were refilled.  Her request for Soma was denied.  R. 503.  On May 21, she returned with complaints of pain in her low back and foot.  Her prescriptions were refilled.  R. 502.

On June 4 and 18, Truvillion reported low back pain.  Her prescriptions were refilled.  R. 500-501.  On June 29, she reported that she was feeling better.  Her prescriptions were refilled.  R. 499.  On July 16 and 30, she was seen at New Life with low back pain.  Her prescriptions were adjusted.  R. 497-98.

On August 13, Truvillion was seen at New Life with low back pain.  She reported that Norflex worked better than Flexeril.  Medication was prescribed.  R. 496.

On August 13, Truvillion was seen by Winston Murray, M.D.  R. 60-608.  She requested medication for blood sugar and blood pressure.  She asked for a referral to an orthopedist or a neurologist.  MRIs of the neck and lumbar spine were ordered.  She was referred to Dr. Lori

14

Summers.  Her prescriptions were refilled.  R. 607.  On August 27, Truvillion was seen at New Life.
Her prescriptions were refilled.  R. 495.

On September 7, Truvillion was seen at the emergency room at Hood Memorial.  R. 636.
She displayed signs of anxiety.  She reported that she was out of antidepressant medication and her
heart was racing.  She was not in acute distress and it was deemed not an emergency.  She was
referred back to the pain clinic to refill her prescriptions.  R. 636.  She was told to take Benadryl as
needed for anxiety.  R. 637.

On September 10 and 24, Truvillion was seen at New Life for refills of her medication.  She
was sleeping and eating well.  R. 493-94.

On October 1, there were MRIs of the cervical and lumbar spine.  There were no significant
abnormalities in the cervical spine.  There were minimal disc bulges in the upper thoracic spine.  R.
721.  Degenerative changes were most prominent at L4-5 and L5-S1.  There was a probable small
annular tear near the neural foramen on the left at L4-L5 with mild associated foraminal narrowing.
There was a diffuse disc bulge at L5-S1 which was slightly more prominent on the left.  It could
affect the descending left S1 nerve root.  R. 722-23.

On October 8 and 22, Truvillion was seen at New Life for pain management.  She reported
she was not sleeping well and was depressed.  Her prescriptions were adjusted.  R. 491-92.

On November 5, Truvillion was seen at New Life for pain management.  The diagnoses
included low back pain, insomnia and depression.  Her medication was adjusted.  R. 490.  On
November 19, she requested Vicodin and Percocet.  Her medication was adjusted.  She was started
on Vicodin.  R. 489.  On December 3, her medications were adjusted.  R. 488.

On December 13, Truvillion was seen at Hood Memorial emergency room after a slip and fall at a Winn-Dixie store. She sustained multiple contusions. Medication was prescribed. She was to follow-up with her primary care doctor. R. 630-32. X-rays were negative for the right ankle, right hip and right shoulder. There were mild degenerative changes at C5 and minimal degenerative lumbar changes at L5. R. 633.

On December 15, Truvillion was seen at New Life. She complained of pain and muscle spasms following the fall at the Winn-Dixie. Medication was prescribed including Neurontin, Norflex, MS-Contin, Vicodin and Valium. R. 487. On December 31, she was still hurting from the fall. Her medications were adjusted. R. 486.

<u>2008</u>

On January 14 and 28, Truvillion was seen at New Life for pain management. She was sleeping and eating well. She complained of low back pain and muscle spasms. Her medication was adjusted. R. 653-54. On February 11, she was diagnosed with an upper respiratory infection, sinusitis and low back pain. Her medication was adjusted. R. 652. On February 25, she reported she was doing well on Percocet. She was continued on Percocet and Valium. R. 651.

On March 10, Truvillion returned to New Life for pain management. Medication to help her sleep was added. R. 650. On March 21, her medication was adjusted. R. 649. On April 7, she reported she was sleeping well and there were no other complaints. Her medication was continued. R. 648. On April 21, she complained of pain of 6-7 out of 10. She asked for additional medication. The Percocet was increased. R. 647. On May 5 and 19, her medication was continued. R. 645-46.

On May 20, Truvillion was seen by Lori Summers, M.D., a neurosurgeon. She was referred to Dr. Summers for a surgical evaluation. Truvillion reported that her primary care physician

stopped prescribing Percocet, and she wanted another physician to do this.[5]  On examination, her gait was normal.  Her muscle tone was normal in all 4 limbs.  There was no atrophy in any limb. There was a full range of motion in her arms and legs.  The straight leg test was negative bilaterally. The cervical range of motion was normal.  The lumbar range of motion was within normal limits. The neurologic examination was normal.  The October 1, 2007 lumbar MRI showed a very mild disc bulge at L5-S1 and mild degenerative changes.  The diagnosis was low back pain with bilateral leg pain.  Dr. Summers did not feel she was a surgical candidate at that time.  She recommended that she stop smoking.  She was referred to North Oaks for physical therapy and epidural steroid injections.  She could obtain medications through her primary care physician.  R. 719-20.  On June 27, North Oaks reported to Dr. Summers that it was unable to provide PT to Truvillion because it was unable to contact her.  R. 724.

On June 2, Truvillion returned to New Life.  She reported that she would see a rheumatolgist. She declined the epidural steroid injections.  The pain was a 9 out 10.  Her prescriptions were refilled.  R. 644.  On June 13 and 26, her prescriptions were refilled.  R. 642-43.

On July 9, Truvillion went to the Hood Memorial emergency room for fever blisters on her mouth and a sore throat.  The diagnosis was herpes simplex with a swollen lymph node in the neck. R. 626-27.

---

[5]  Her medications were listed as:

| Prevacid | Clonazepam | Loratadine | Butalbital | Fluconazole |
| Actos | Vytorin | Enalapril | Neurontin | Valium |
| Elavil | Fortamet | Buspirone | Percocet | Norflex |

R. 718.

On July 14, Truvillion was seen at New Life.  She asked that the Percocet be changed to Percodan.  The change was prescribed.  R. 641.  On July 28, the Percodan was changed to Lorcet. R. 640.

On August 5, Truvillion was seen by Winston L. Murray, Jr., M.D., who had not seen her since August 13, 2007.  She had a rash on her left arm and itching on her right thigh.  A cream was prescribed.  She was referred to Dr. Henchy.  She was to return in 2 months.  R. 593.

On August 11, New Life adjusted her medication.  R. 639.

On August 21, Truvillion was seen by Malik Spady, M.D., a rheumatolgist.  R. 524.  On exam there was a full range of motion in her neck.  She was diagnosed with Herberden's nodes and Bouchard nodes on her fingers.  R. 526.  The diagnoses were low back pain, rheumatoid arthritis, leg pain, ankle and foot pain, generalized anxiety and hypertension.   Tests were ordered. Medication was prescribed for rheumatoid arthritis.  R. 527.

On October 31, Truvillion was seen by Dr. Spady.  R. 529.  For her social history, he noted that she could bathe herself, control her bladder and bowel function, converse in a meaningful manner, dress and feed herself, find her way home, live independently, recognize familiar faces, remember her name, where she lived and the current date.  She could not clean the house, cook meals or drive a car.  R. 530.  Medication was prescribed and tests were ordered.  R. 532.

<u>2009</u>

On February 6, Truvillion was seen by Dr. Spady.  Her social history was unchanged from October 31, 2008.  The notes report that Truvillion did not have the lab work done that was ordered in October.  Medication was prescribed.  R. 534-37.

On March 2, Truvillion was seen at the Hood Memorial emergency room. The codes cited for her complaints referred to: (1) long term use of medication (V58.69); (2) malaise and fatigue (780.79); and (3) lumbago (724.2). R. 618. There was lab work. R. 620-621.

On May 14, Truvillion was seen by Dr. Spady. Injections were prescribed. R. 664-65.

On July 11, Truvillion was seen by Christino Dijamco, M.D., for a consultative examination. R. 562-65. Dr. Dijamco stated:

> Although she gave a 10-year history of hypertension and diabetes, there is no clinical evidence of end-organ damage at this time. Hypertension appears to be under good control. Gylcemic control is unknown at this time with no records of hemoglobin A1Cs.

> With regard to the degenerative disc disease, passive range of motion limitations was suspect with inconsistent findings as mentioned above. With mental problems, she just claimed to be depressed a lot, but did not show any evidence at this time. She had no functional limitations supported by objective findings at this time.

R. 564-65.

On August 3, a Disability Determination medical consultant limited Truvillion to a light residual functional capacity. R. 575.

On November 16, Truvillion was seen by Bilat Choudry, M.D., a neurologist. R. 740. On exam, there was a normal range of motion, normal strength, no tenderness, normal gait, normal bulk and tone. R. 744. For her lumbago, Dr. Choudry prescribed medication. He ordered a test for her left arm and leg to rule out radiculopathy in her leg. He suggested that there may be a psychological component to her complaints and that she see a psychotherapist. She wanted to wait on this. He advised her that "narcotics can treat pain acutely, but when taken routinely actually cause the pain to come back more frequently, but she of course was reluctant to believe this, and would like to

continue her narcotics." R. 745.  There is no evidence that she had the test to rule out radiculopathy

in her left leg.  There is no report of a further visit to Dr. Choudry.

On December 1, Truvillion and her cousin, Tina Henry, were interviewed by the Louisiana

Department of Health & Hospitals concerning the provision of personal care services.  R. 714.

On December 22, Truvillion was seen by Dr. Spady.  R. 694.  There was no change in the

social history from October 31, 2008.  R. 695.  Xanax was prescribed for her anxiety.  R. 697.

<u>2010</u>

On May 12, Truvillion's name was placed on the Request for Services Registry with

Louisiana Options in Long Term Care.  R. 711.  On June 15, she was notified by the Louisiana

Department of Health & Hospitals of its agreement to provide personal care services to her.  R. 713-

16.

On July 26, Truvillion was seen by Dr. Spady.  R. 690.  The social history was unchanged

since October 31, 2008.  R. 691.  A lumbar CT scan was ordered.  R. 692.  Lab studies were ordered.

R. 693.  An August 18 lumbar CT scan revealed:  (1) no fractures, malalignments, spondylolisthesis

or spondylolysis; (2) no significant degenerative changes; and (3) a disc bulge at L4-5 and possibly

one at L5-S1.  R. 773.

On November 1, Truvillion was seen by Dr. Spady.  R. 686.  Dr. Spady reported that she

could not bathe herself, clean the house, control her bladder, cook meals, dress herself, drive a car

or live independently.  R. 687.  Medication was prescribed.  An epidural steroid injection was

ordered.  R. 688.

On December 3, Charles Lee, M.D., completed a one page disability determination form and

recommended that Truvillion's residual functional capacity was less than sedentary.

20

<u>2011</u>

In response to a report of leg pain, there was an x-ray on February 14.  The bony structures were intact and there were no fractures or areas of bone destruction.  R. 736-37.

On March 11, Truvillion was seen by Dr. Spady.  Injections were ordered for low back pain. R. 731.

On March 21, Truvillion was seen at the Rosenblum Mental Health Center ("Rosenblum"). She went on her own without a referral.  She reported major depression-like symptoms, for example she thought of suicide 2 weeks before following a physical fight with her 19 year old son.  She took more Xanax than was prescribed, so she ran out 3 days before coming to Rosenblum.  She felt fine as long as she had Xanax.  Antidepressants were ineffective.  The psychiatrist questioned whether she felt fine when taking Xanax because of her symptoms, including weight loss.  He prescribed Ativan to get her to the next doctor's appointment without seizures.  He ordered Buspar for anxiety and attempted to convince her that Xanax was increasing her depression.  The psychiatrist concluded that Truvillion "will either engage in treatment or become a short-term patient with a Substance Abuse referral."  R. 750.  The psychiatrist completed a report for Truvillion's treating physician.  He suggested that Xanax be prescribed in weekly increments with refills, so withdrawal would not be much of an issue.  R. 742.

On June 1, a social worker at Rosenblum received a call from Dr. Spady's office.  Truvillion continued to run out of Xanax.  There was concern for Truvillion's anxiety and a need for treatment. Dr. Spady's office reported that Truvillion "constantly calls their office and the pharmacy about her Xanax and 'we just don't know what the problem is.' "  R. 762.  The Rosenblum social worker called Truvillion.  She reported family stress which made her take more Xanax to help her nerves.  R. 762.

On June 2, Truvillion called the Rosenblum social worker and reported that she was unable to take the medication prescribed by Rosenblum because Xanax was all that helped.  R. 761.  On June 3, Truvillion reported that she was not interested in the medication prescribed by Rosenblum.  R. 759. On June 21, Rosenblum reported to Truvillion that her case would be closed.  She wanted to continue to see Dr. Spady.  R. 759.  On June 23, Truvillion called Rosenblum and reported that Dr. Spady did not want to prescribe Xanax anymore.  She wanted Rosenblum to prescribe it for her.  The Rosenblum social worker responded that it would not prescribe Xanax for her.  Truvillion replied that she would be out of Xanax by June 27.  R. 759.

On June 24, the Rosenblum psychiatrist noted he would not prescribe drugs with Benzodiazepine and Truvillion's case would be closed.  R. 760.  Truvillion was informed that Rosenblum would not prescribe Xanax or any other drug with Benzodiazepine.  She was told to contact Dr. Spady to obtain a weaning dose of Xanax.  An appointment was scheduled for July 22. She was told that if she did not attend the appointment, her case would be closed.  R. 760.  On July 22, her case was closed.  R. 749.

On August 12, Truvillion was seen by Dr. Spady.  R. 732-35.  Her medications did not include Xanax.  R. 733-34.  On exam she was anxious and seemed to be in moderate pain. Medication was prescribed for inflammatory arthritis.  R. 734.

On November 13, Truvillion was seen at the North Oaks Medical Center ("North Oaks") emergency room.  R. 785.  She had been hearing voices and hallucinating for 4 days.  R. 803.  She reported that her doctor took her off of Xanax.  She denied suicidal thoughts.  R. 786.  A drug abuse screen was positive for Phencyclidine and barbiturates.  R. 797.  She appeared to have mania with

psychosis versus secondary to bath salts.  She denied any bath salt usage.  R. 804.  A chest x-ray was normal.  R. 807.  She was set for transport to Beacon Behavioral Health.  R. 786 and 795.

On November 13, Truvillion was admitted to Beacon Behavioral Hospital.  She was discharged on November 16.  Her attending physician was Abdul M. Khan, M.D.  R. 813.  Medication was administered.  R. 813-14.  She received therapy.  By November 16, she denied any suicidal thoughts or plans.  She was stable and in no acute distress.  She was discharged with her family.  She was to follow-up at Rosenblum for medication management and therapy.  The final diagnosis included brief psychotic episode.  R. 814.

d.      **Plaintiff's Appeal.**

**Issue no. 1.**      Is the transcript of the January 26, 2012 hearing sufficiently complete?

Truvillion reports that:  (1) after the Appeals Council remand, the ALJ obtained additional medical evidence from Dr. Beard; (2) he is the only physician, who testified after the remand; (3) Dr. Beard's medical opinion is the only opinion rendered on the complete medical record; (4) at the January 26, 2012 hearing Dr. Beard's testimony was partially inaudible; and (5) Dr. Amusa, who testified on March 10, 2010, testified before much of Truvillion's medical history became part of the administrative record.  Truvillion contends that: (1) the evidence demonstrates that there was more than a minimal change in Truvillion's condition between the May 24, 2010 decision (R. 118-32) and the April 19, 2012 decision (R. 14-28); (2) the record does not contain ample evidence from which the ALJ's determination may be made; and (3) the inadequacy of the record requires remand.

The Commissioner responds that: (1) although Dr. Beard's testimony was partially inaudible, he did not believe that Truvillion was disabled; (2) he testified that Truvillion could lift up to 10 pounds and needed a sit/stand option; (3) he commented that Truvillion appeared to have imaginary

complaints and was also untruthful; and (4) Truvillion has not demonstrated that there was harmful error because of the inaudible portions of Dr. Beard's testimony.

The June 16, 2001 order of remand provided that the ALJ was to:  (1) request updated evidence of Truvillion's impairments from her treating sources; (2) obtain additional evidence concerning her impairments to complete the record in accord with the regulatory standards; (3) if necessary, obtain evidence from a medical expert to clarify the nature and severity of Truvillion's impairments; and (4) if warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on her occupational base.  R. 134-36.

The ALJ obtained testimony from Dr. Beard.  R. 72-80.  Dr. Beard identified Truvillion's medically determinable impairments as:  (1) diabetic with no major end organ damage; (2) hypertension with no major end organ damage; (3) low back pain and generalized muscular pain with very little evidence to support any major pathology; and (4) spinal stenosis in L5-S1 with diffuse disc bulge at L5-S1 and question of impingement on the S1 nerve root.  R. 74-75.  Dr. Beard testified that Truvillion's impairments did not meet or equal any of the Commissioner's medical listings.  R. 75.  Dr. Beard did not consider Truvillion's back problem (the stenosis and S1 impingement) to be a severe impairment.  R. 75.  Dr. Beard agreed that Truvillion's conditions imposed functional limitations on her.  R. 76.  Based on objective findings only, his opinion as to functional impairment was that Truvillion would be expected to tolerate a light physical activity with a ten pound lifting limit and sit/stand option.  R. 76.  He recommended that she start at a sedentary level and improve gradually to restricted light level.  R. 77.

After the Appeals Council's June 16, 2011 remand:  (1) Truvillion was in contact (June 21-July 22, 2011) with Rosenblum regarding her request for Xanax; (2) there was an August 12, 2011

24

visit to Dr. Spady; and (3) she received treatment at North Oaks emergency room and Beacon Behavioral Hospital (November 13-16, 2011) for a brief psychotic episode where she tested positive for Phencyclidine and barbiturates.  She was not seen for a consultative examination after the June 16, 2011 remand.  Dr. Beard was the only physician to testify who was in possession of the entire medical record through the Beacon Behavioral hospitalization in November 2011.

The record demonstrates that small portions of Dr. Beard's testimony were inaudible.  R. 74-80.  The ALJ stated that Dr. Beard's, "his testimony was partially inaudible."  R. 25.  The Commissioner confirms that.  Rec. doc. 17 (Memorandum at 2).

Dr. Amusa testified at the March 10, 2010 hearing.  Prior to the hearing, he received Exhibit nos. C1F through C21F (R. 419-654).  R. 39.  During the hearing, Exhibit C22F with the record of Dr. Spady's treatment from August 21, 2008 through December 22, 2009 (R. 655-685) was faxed to him.  R. 39 and 58.

The ALJ found that were was minimal material change in Truvillion's condition after the May 24, 2010 decision.  R. 14-15.  This is disputed by Truvillion.  After the ALJ's May 24, 2010 decision, the following was added to the record from Truvillion's treating sources:  (1) on May 20, 2008, she was seen by Dr. Summers; (2) on November 16, 2009, she was seen by Dr. Choudry; (3) she was seen by Dr. Spady on December 22, 2009, July 26, 2010, November 1, 2010, March 11, 2011 and August 12, 2011; (4) on March 21, 2011, she went to Rosenblum; (5) from June 1 through June 24, 2011, she was in communication with Rosenblum; and (6) from November 13-16, 2011, she was seen at North Oaks emergency room and admitted to Beacon Behavioral hospital.[6]

---

[6] From January 12 through February 2, 2012, Truvillion submitted additional records of treatment to the Commissioner.  See Exhibits C28F-C34F (R. 717-830).  Some of the records pre-date the May 24, 2010 decision but they were not submitted until after the May 24, 2010 decision.  See for example, January 12, 20012 letter submitting the medical records from Dr. Summers for October 1, 2007 through June 27, 2008.

On August 18, 2010, there was a lumbar CT scan which did not reveal any fractures, malalignments, spondylolisthesis, spondylolysis or significant degenerative changes. It did reveal a disc bulge at L4-5 and possibly one at L5-S1. R. 773. A February 14, 2011 leg x-ray found the bony structures intact and no fractures or areas of bone destruction. R. 736-37. A November 13, 2011 chest x-ray was normal. R. 807. These tests are objective evidence of Truvillion's condition that were not before Dr. Amusa or the ALJ at the time of the May 24, 2010 decision. They do not reflect any change in Truvillion's condition from the objective evidence that was available at the time of the May 24, 2010 decision.

In her May 20, 2008 examination, Dr. Summers, the neurosurgeon, found that Truvillion's gait and muscle tone were normal, there was no atrophy in any limb, there was full range of motion in her arms and legs, the straight leg test was negative bilaterally, the cervical and lumber ranges of motion were within normal limits, and the neurological examination was normal. Dr. Summers concluded that she was not a candidate for surgery. Instead Dr. Summers recommended physical therapy and epidural steroid injections. R. 719-20. Truvillion refused to follow Dr. Summers' recommendation. On November 16, 2009, she was seen by Dr. Choudry, a neurologist. His findings were similar to Dr. Summers' findings. On exam, he found a normal range of motion, normal strength, no tenderness, normal gait, normal bulk and tone. R. 744. He prescribed medication for her low back pain. He suggested she see a psychotherapist because of a possible psychological component to her pain. He cautioned her that the routine consumption of narcotics would cause the pain to come back more frequently. Notwithstanding Dr. Choudry's recommendation, Truvillion wanted to continue her narcotics. R. 745.

From March through July 2011, she sought more Xanax than Dr. Spady was willing to prescribe.  On March 11, she received injections for low back pain at Dr. Spady's office.  R. 731. On March 21, she appeared at Rosenblum reporting depression-like symptoms and requesting more Xanax.  The psychiatrist attempted to convince Truvillion that the Xanax was making her depression symptoms worse rather than better.  R. 750.  Truvillion refused to accept this advice.  On June 1, Dr. Spady's office called Rosenblum to report that Truvillion was constantly calling Dr. Spady's office and the pharmacy about Xanax.  R. 762.  Rosenblum refused to prescribe Xanax for her.  She was told that Dr. Spady had to wean her off of Xanax.  R. 760.  By August 12, 2011, Dr. Spady was no longer prescribing Xanax.  R. 733-34.

In November 2011, she tested positive for Phencyclidine and barbiturates.  R. 797. Notwithstanding this positive test and 4 days of hearing voices and hallucinating, she denied any bath salt usage.  R. 804.  The final diagnosis was a brief psychotic episode.  R. 814.

After the May 24, 2010 ALJ decision, there was no change in Truvillion's symptoms except she experienced difficulty in being weaned off of Xanax and a brief psychotic episode just before she tested positive for Phencyclidine and barbiturates.  The only other change in her condition was the determination of the Louisiana Department of Health & Hospitals to provide personal care services for her.  R. 713-716.

The ALJ found that Truvillion was less than credible.  R. 25.  The ALJ noted that:  (1) her allegations changed from her prior hearing but her treatment did not; (2) while Louisiana agreed to provide an aide to help her with household chores, the reports from Dr. Spady prior to Louisiana's decision reflected that she could bathe and dress herself, cook meals and live independently; and (3) the aide, who certified Truvillion's need for the care, was her cousin.  R. 25.  The ALJ concluded

that, "[c]learly, the amount of assistance the claimant requires depends on what help she is seeking." R. 25.

There is substantial evidence to support the ALJ's determination on Truvillion's credibility and the ALJ's finding that were was minimal material change in her condition after the May 24, 2010 decision.

Truvillion's final point is that because of the inaudible portions of Dr. Beard's testimony, the record does not contain ample evidence from which the ALJ's determination may be made. Truvillion states:

> The touchstone for determining whether an administrative record is inadequate for judicial review "is not whether evidence is missing, but whether the existing record contains ample evidence from which a determination may be made." *Torres v. Shalala*, 48 F.3d 887, 894 (5th Cir. 1995).

Rec. doc. 16 (Memorandum at 21). Part V of the opinion in Torres is concerned with the sufficiency of an administrative record. 48 F.3d at 893-94. The appellant urged that the application of *res judicata* violated due process. The Fifth Circuit stated that, "Appellant has not demonstrated that loss of the (tape) recording affected the ability of the ALJ to render an informed decision, and no violation of due process has been proven." Id. at 894. The phrase "whether the record contains ample evidence from which a determination may be made" does not appear at page 894 in the Torres decision or anywhere else in the decision. The test as described by Torres is whether the deficiency in the record (the loss of the recording) affected the ability of the ALJ to render an informed decision. The inaudible portions of Dr. Beard's testimony did not affect the ability of the ALJ to render an informed decision on Truvillion's application for SSI benefits.

28

**Issue no. 2.**     Did Truvillion have sufficient opportunity to cross-examine Dr. Beard at the January 26, 2012 hearing?

Truvillion contends that she was unable to effectively cross-examine Dr. Beard because he testified by telephone instead of in person or by video conference as specified in 20 C.F.R. § 404.936.  She urges that it was evident that Dr. Beard had difficulty hearing the questions.  Her counsel objected to him testifying by phone.  When Dr. Beard completed his testimony and the phone link was disconnected for both Dr. Beard and Truvillion, the ALJ stated: "[o]kay, that was useless."  R. 81.

The Commissioner agrees that Dr. Beard had difficulty hearing questions.  When the questions were repeated, the Commissioner contends Dr. Beard was able to respond to them.  The Commissioner contends that Truvillion has not demonstrated any prejudice.

The ALJ stated that he accorded little weight to Dr. Beard's medical testimony as it was unclear that he had actually considered all of the evidence.  R. 25.  Even if Truvillion's cross-examination was hampered by the use of the phone, there is no prejudice where little weight is accorded the testimony.  The ALJ stated that Dr. Beard's opinion was fairly consistent with the record.  There is substantial evidence to support this conclusion.  For example, Dr. Beard opined that she could do sedentary work.  Dr. Summers, the neurosurgeon, referred her for physical therapy.  Dr. Summers did not impose any limitations on her.  Truvillion has not demonstrated that she was prejudiced by Dr. Beard testifying by phone.

**Issue no. 3.**     Whether substantial evidence and relevant legal precedent support the ALJ's determination of Truvillion's residual functional capacity?

Truvillion states:

> Dr. Amusa testified that Truvillion needed to be able to change positions as needed for her comfort and pain.  The ALJ purported to accord substantial weight to

29

> Dr. Amusa's opinion, but did not include this limitation in the RFC, instead finding that Truvillion required the ability to change positions "as needed while remaining on task."   While the VE at the second hearing testified based on this "while remaining on task" limitation, the VE at the first hearing testified that if Truvillion had to change position from sitting and standing, not just for a second or two, but for any length of time, she would be unable to work.

Rec. doc. 16 (Memorandum at 24) (citations omitted).  Truvillion concludes that the ALJ's RFC was not based on substantial evidence.

> At the March 10, 2010 hearing, Dr. Amusa testified, in part, that,

> I would restrict her to . . . not having to lift anything greater than 10 pounds, and . . . she should have the ability to change positions as, as needed for her comfort, her pain; that she should not have any, any problem with standing or walking for at least 2 hours in a day.

R. 45.  During the examination of the vocational expert, the ALJ began with sedentary work for a younger individual with a limited education and asked if in Louisiana there were jobs such an individual could perform.  R. 64.  The expert responded that there were jobs for an unskilled sedentary worker.  R. 64.  The ALJ stated that she would like to add to that hypothetical to cover Dr. Amusa's testimony.  The ALJ added limitations, including that "the individual would be able to change position as needed. . . ."  R. 64.  The expert responded that if changing position meant you could stand up and stretch or maybe walk to the restroom, the individual could perform the jobs.  R. 65.  If, however, the individual had to take breaks every hour for at least 10 minutes while alternating sitting and standing to relieve pain, the individual could not perform those jobs.  R. 65.  An employer would not allow an individual to take 10 minute breaks every hour.  R. 66.

> Truvillion's counsel asked if an individual needed to change positions from sitting and standing, not for a second or two, but for any length of time – anywhere from 10 to 20 minutes, would there be jobs available.  R. 67-68.  The vocational expert answered "no."  R. 67-68.

30

At the April 3, 2012 hearing, the ALJ posed the hypothetical to the vocational expert with the limitation that "she requires the ability to alternate positions on an as needed basis <u>while remaining on task</u>."  R. 107 (emphasis added).  The vocational expert testified that with this limitation there were jobs available.  R. 108.  On April 19, 2012, the ALJ found that Truvillion had the RFC to perform sedentary work with some limitations, including "she requires the ability to alternate positions as needed while remaining on task."  Rec. doc. 18.

On March 10, 2010, Dr. Amusa simply stated that she should have the ability to change positions as needed for her comfort.  R. 45.  When the ALJ questioned the vocational expert, the limitation, as stated by Dr. Amusa, was added to the sedentary hypothetical.  R. 64.  The vocational expert responded that if by changing position, the individual could stand up and stretch, sedentary positions were available.  R. 65.  If, however, the individual had to take a 10 minute break every hour, there would be no jobs.  R. 65.  Truvillion's counsel expanded this to 10 to 20 minute breaks every hour.  R. 67-68.  Of course, the vocational expert responded that there were no jobs available with such a limitation.  R. 68.

In the April 3, 2012 hearing, the ALJ added the phrase "while remaining on task."  Rec. doc. 107.  That is consistent with Dr. Amusa's testimony on the restrictions on Truvillion.  R. 45.  Truvillion's contention that the ALJ's restrictions at the April 3, 2012 hearing (R. 107-08) and in the RFC in the April 19, 2012 decision (R. 18) are not based on substantial evidence is without merit.

### <u>RECOMMENDATION</u>

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 17) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 16) be DENIED.

**<u>OBJECTIONS</u>**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 2nd day of January, 2014.

**SALLY SHUSHAN**
**United States Magistrate Judge**